UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM HOGAN,

Plaintiff,

-vs-

Case No.
Hon.

THE ROMINE GROUP doing business as BRADFORD ACADEMY ELEMENTARY SCHOOL and NICHOLUS SOUTH,

Defendants.

---

Darcie R. Brault (P43864)
DIB, FAGAN AND BRAULT, P.C.
Attorney for Plaintiff
25892 Woodward Avenue
Royal Oak, MI 48067-0910
(248) 542-6300
dbrault@dibandfagan.com

---

# COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, WILLIAM HOGAN, by and through his attorneys, DIB, FAGAN AND BRAULT, P.C., and for his cause of action against the Defendants, states as follows:

## JURISDICTIONAL ALLEGATIONS

1. Plaintiff, WILLIAM HOGAN is an individual residing in Troy, Michigan.

2. Defendant THE ROMINE GROUP, doing business as BRADFORD ACADEMY ELEMENTARY SCHOOL, is a Michigan corporation and at all times pertinent hereto conducted business in the State of Michigan.

3. Defendant NICHOLUS SOUTH, is an individual who, upon information

and belief, resides in the State of Michigan.

4. At all relevant times, Plaintiff was employed by Defendant, working in the City of Southfield, County of Oakland, State of Michigan.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 (federal question), and 28 U.S.C. §1367 (supplemental).

## GENERAL ALLEGATIONS

6. Plaintiff became an employee of Defendant ROMINE GROUP as a teacher beginning in August of 2007.

7. Beginning in early 2010, there were several incidents of sexually harassing behavior by a Fourth Grade male student, BOY #1, targeting several Fourth Grade students (GIRL #1, GIRL #2, GIRL #3, GIRL #4, GIRL #5, GIRL #6 and others):

a. BOY #1 made the statement about GIRL #2 and GIRL #3, "She is a fine girl and I want to sex her."

b. BOY #1 told one of the girls that he wanted to "sex" her mother.

c. BOY #1 referred to the girls in the class as bitches and addressed them as "bitch."

d. BOY #1 frequently simulated sexual acts in the classroom, lunchroom, and bathroom, including masturbation, and humping.

e. BOY #1 frequently made statements to the girls as he touched himself, e.g. that he wanted to "sex" them and others.

f. BOY #1 stated to the Fourth Grade students, "I want to do it with you."

g. BOY #1 said he wanted to "make babies" with GIRL #3, GIRL #2, GIRL #6 and others.

h. BOY #1 referred to the girls as "1 (800) Five Star Chicks."

i. BOY #1 would sing songs to the girls with sexually explicit lyrics, including "I can make your bed rock," "every girl in the world," and

other songs with references to hardness, frequent sexual profanity, sexual brutality, etc.

j. BOY #1's conduct was extremely disruptive to the class.

8. Hogan prepared disciplinary forms for these incidents and provided them to his supervisors with the recommendation that the student, BOY #1, be suspended and that the administration be consulted for further action.

9. One of the Defendant's officials, Keller (acting Vice Principal) advised at least some of the children not to speak to their parents about the sexually harassing behaviors.

10. Keller disbelieved the allegations made by GIRL #6 because she "can't believe anything that comes out of that little girl's mouth."

11. No action was taken.

12. BOY #1 threatened Hogan, to wit; to "blow the junk out of his mouth."

13. On March 1, 2010, Calloway, the Vice Principal of Defendant School, returned from sick leave.

14. On March 5, 2010, after receiving two student complaints and personally observing BOY #1 being disruptive, Hogan brought BOY #1 to Calloway's office.

15. Calloway advised that she did not believe the children's accusations and was concerned that Hogan had brought them to her attention as the allegations were not serious.

16. Calloway advised that the "kids are just ganging up on [BOY #1]"

17. Hogan asked how Calloway believed he should have handled things.

18. Calloway advised Hogan that he should contact both sets of parents, inform them of the allegations and advise the parents that the school was addressing

the issue.

19. Hogan questioned her about his authority to resolve such serious complaints, but agreed to follow her suggestion.

20. That day, Hogan began contacting the parents of the children who were harassed, but was interrupted by a call to the office from Defendant South.

21. Defendant South was upset that Hogan had contacted parents.

22. Calloway denied having advised Hogan to do so.

23. Hogan authored a letter to THE ROMINE GROUP and South, again advising of the student sexual harassment complaints and his interaction with Callaway and South on March 5, 2010.

24. Hogan's letter specifically addresses the school administrators' failure to address the sexual harassment complaints.

25. Also on March 7, 2010, Hogan contacted THE ROMINE GROUP and indicated that he feared losing his job because of his attempts to redress the sexual harassment complaints of his students.

26. The Defendant THE ROMINE GROUP's president, Paul Romine, advised Hogan to maintain "a positive attitude."

27. On March 8, 2010, Hogan met with Defendant South and two other school officials to discuss BOY #1's behavior.

28. At the end of the meeting Hogan raised his concern about to handle the complaints of sexual harassment.

29. South advised Hogan that if he did not witness the sexual harassment, it did not occur.

30. Hogan requested written procedures for reporting sexual harassment.

31. On March 9, 2010 Hogan received a complaint from GIRL #2, GIRL #5, GIRL #4 and GIRL #3 that another male student, BOY #2, said he was going to "take over" BOY #1's role, that he simulated sexual acts with a chair, he wanted to "make some magic" with them and if they told anyone he would shoot them, made references to "working the magic finger," made sexual comments about their body parts and said "girls be on his dick all night."

32. Hogan asked the students to write out their complaints.

33. Hogan called South, who then came to the classroom.

34. Initially, South refused to acknowledge the complainants because they did not raise their hands to be called upon.

35. Eventually, South took the written complaints without addressing Hogan, the class, the complainants, or BOY #2.

36. On March 10, 2010, one of the parents of the harassed students contacted Calloway and complained. She specifically asked that Calloway speak to her daughter and take action on her behalf.

37. On March 11, 2010, Calloway responded to the parent that she was "looking at the issue up close and from afar."

38. On March 11, 2010, several students again complained to Hogan, stating that BOY #1 was harassing them during recess and in the classroom and that he was threatening them with violence:

a. By calling them "stupid bitches"

b. Pushing GIRL #2 and GIRL #4.

c. Telling GIRL #4 and GIRL #2 that he would beat them up.

d. Making explicit sexual comments and references to their body parts.

39. On March 11, 2010, Hogan asked South, again, for written procedures he wanted Hogan to follow regarding sexual harassment complaints.

40. In the e-mail message, Hogan advised South that he had received several new complaints from his students which he hoped to resolve as soon as possible.

41. South responded with a sparse description of a process that raised more questions than answers and failed to address how to interface with the complaining student.

42. On March 12, 2010, Hogan sent an e-mail to South requesting a clarification of the sparsely outlined process and emphasizing his request that the students' complaints be addressed.

43. On March 12, 2010, South responded as if he were unaware of the nature of the problem and indicating that "when [his] schedule allow[ed]" he would "visit" the class and "have a discussion with" the students "regarding this issue."

44. On March 15, 2010, South came to Hogan's class and told the students that there were three sides to every story, questioned what they knew about "credibility," and then met with only two individual students and failed to ask any questions about the complaints, about BOY #2, or to speak to any of the girls who complained.

45. On March 19, 2010 GIRL #2's mother attended a meeting with Keller and advised Keller that her daughter's attendance issues were directly related to the harassment, and asked Keller to speak to Calloway about her planned course of action.

46. After the meeting, GIRL #2's mother went to the lunchroom, observed

verbal harassment of her daughter, to wit, BOY #2 telling her nine-year old daughter that he "was going to put his tongue in her pussy," and immediately left the school with GIRL #2.

47. GIRL #2's mother then sent an e-mail to Calloway advising her what she witnessed and asking for a solution. She specifically advised that the conduct was blatant sexual harassment and that there had to be something done immediately to address the issue.

48. On March 19, 2010, Hogan received complaints from GIRL #1, GIRL #4, and GIRL #2 that BOY #2 made sexually explicit comments to them in the lunch room, including stating he was "going to stick his tongue up [their] butthole" and "lick" GIRL #6, GIRL #4 and GIRL #2's "pussy."

49. Hogan forwarded the complaints immediately to the administration.

50. On March 22, 2010 South wrote a letter to BOY #2's parents indicating that BOY #2 admitted to the comments and that South "strongly advised him about engaging in any conversation that is inappropriate for a school setting."

51. No disciplinary action was taken.

52. South warned only that "should this matter persist" there may be recommendations for "further disciplinary consequences if warranted."

53. On March 22, 2010 Hogan reminded South of the allegations against BOY #2 from March 9, 2010 and that those complaints had not been addressed.

54. On March 23, 2010, GIRL #2 and GIRL #5 advised Hogan that in gym class, BOY #2:

a. Stated "he can lick my pussy and I need to hump him before he beat my ass."

b. “he is going to make babies with us and make white stuff come out of it.”

c. “he wanted to sex us so f------- bad and he said he already humped us so he was going to do it again.”

55. Hogan immediately advised Defendants of the new complaints.

56. Also on March 23, 2010, GIRL #2’s mother asked for copies of the incident reports involving her daughter and asking for the sexual harassment policy and code of conduct.

57. On March 23, 2010, South indirectly informed Hogan that BOY #2 had been issued a 3-day “cooling off” period in response to the allegations.

58. Also on March 23, 2010, South, Hogan and other school officials met with BOY #1 and his mother to discuss his behavior. South directed Hogan to explain all of the allegations to BOY #1’s mother and insisted that he do so without reference to any of the written documentation or file.

59. When Hogan asked for the file to assist his memory of the events that had occurred weeks earlier, South was visibly annoyed.

60. On March 24, 2010, Hogan was called into a meeting with South, Calloway, Keller and others, including Vice President of the Romine Group, Will Kneer.

61. At the meeting Hogan was accused of lying, of “hating” BOY #1 and being used by his Fourth Grade students as a “puppet” to “orchestrate” their sexual harassment allegations.

62. Hogan was then fired.

63. Also on March 24, 2010, GIRL #2’s mother was informed by Calloway that she had no knowledge of any incident reports.

64. Complaints of sexually harassing behavior continued throughout the school year.

**COUNT 1 – Title IX Retaliation**

65. Plaintiff incorporates paragraphs 1 through 64 above as if specifically repeated herein.

66. Title IX of the Education Amendments of 1972 provides that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ." 20 U.S.C. § 1681(a).

67. Gender discrimination under Title IX includes sexual harassment.

68. Title IX also prohibits retaliation against persons who complain of sex discrimination.

69. Defendant THE ROMINE GROUP is a charter school which receives federal funding and is, therefore, subject to the anti-discrimination and anti-retaliation provisions of Title IX, 20 USC 7221i.

70. Plaintiff HOGAN engaged in protected activity, to wit, he made a number of reports of student to student sexual harassment, prohibited by Title IX.

71. Defendant THE ROMINE GROUP was aware of HOGAN's protected activity.

72. Defendant THE ROMINE GROUP subsequently took adverse action against HOGAN.

73. Defendant THE ROMINE GROUP violated Title IX's prohibition against retaliation by taking adverse action toward Plaintiff because of his reports of sexual

harassment, including, but not limited to:

a. Terminating Plaintiff; and

b. Other acts of retaliation based upon the Plaintiff's complaints of discrimination, to be determined through discovery.

74. As a direct and proximate result of Defendant's retaliatory conduct toward Plaintiff, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

a. Loss of employment;

b. Loss of promotional opportunities;

c. Loss of employee benefits;

d. Loss of bonuses;

e. Loss of wages, commissions, and earning potential;

f. Loss of value of professional certifications;

g. Loss of professional esteem and consequent damage to Plaintiff's professional career;

h. Extreme embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment;

i. Punitive damages;

j. Other damages to be determined.

75. The above-referenced retaliatory conduct by Defendant THE ROMINE GROUP toward Plaintiff was willful and, as a result, Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff prays that this Honorable Court enter Judgment against Defendant THE ROMINE GROUP, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, past

and future, together with interest, costs, an award of attorney fees, an award of punitive damages and appropriate equitable relief.

**COUNT 2 – VIOLATION OF 42 U.S.C. §1983**

76. Plaintiff incorporates paragraphs 1 through 75 above as if specifically repeated herein.

77. Under the United States Constitution First Amendment, freedom of speech is guaranteed, U.S. Const. Amend, I.

78. Plaintiff HOGAN was engaged in a constitutionally protected activity when he exercised his right of free speech to complain about the sexual harassment.

79. Defendant SOUTH failed to take action to address Hogan's concerns.

80. When Plaintiff HOGAN continued to exercise his rights, Defendant SOUTH took adverse action against him.

81. The adverse action taken against HOGAN by the Defendant SOUTH was motivated, at least in part, as a response to Hogan's exercise of his constitutional rights.

82. At the time that he took adverse action against HOGAN, SOUTH acted under the color of state law.

83. Defendant SOUTH was aware that HOGAN had a right to complain of the sexual harassment of the students.

84. Defendant SOUTH was aware that Hogan's right to complain of the sexual harassment of the students was constitutionally protected.

85. Defendant SOUTH acted with reckless or callous indifference toward Hogan's constitutionally protected right.

86. It would be clear to a reasonable official that SOUTH's conduct was

unlawful; to wit, his attempts to suppress HOGAN's speech and to retaliate against him for engaging in protected speech.

87. Defendant SOUTH violated 42 U.S.C. §1983 prohibition against retaliation by taking adverse action toward Plaintiff because of his reports of sexual harassment, including, but not limited to:

a. Failing to Address his Complaints;

b. Terminating Plaintiff; and

c. Other acts of retaliation based upon the Plaintiff's complaints of discrimination, to be determined through discovery.

88. As a direct and proximate result of Defendant SOUTH'S retaliatory conduct toward Plaintiff, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

a. Loss of employment;

b. Loss of promotional opportunities;

c. Loss of employee benefits;

d. Loss of bonuses;

e. Loss of wages, commissions, and earning potential;

f. Loss of value of professional certifications;

g. Loss of professional esteem and consequent damage to Plaintiff's professional career;

h. Extreme embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment;

i. Punitive damages;

j. Other damages to be determined.

89. The above-referenced retaliatory conduct by Defendant SOUTH toward

Plaintiff was willful and, as a result, Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff prays that this Honorable Court enter Judgment against Defendant SOUTH, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, past and future, together with interest, costs, an award of attorney fees, an award of punitive damages and appropriate equitable relief.

## COUNT 3 – VIOLATION OF ELCRA

90. Plaintiff incorporates paragraphs 1 through 89 above as if specifically repeated herein.

91. The Elliot-Larsen Civil Rights Act (ELCRA) prohibits retaliation against an employee because s/he complained of discriminatory treatment, including sexual harassment.

92. Defendants violated the ELCRA's prohibition against retaliation by taking adverse action toward Plaintiff based upon his report of sexual harassment, including but not limited to:

a. Failing to Address his Concerns;

b. Terminating Plaintiff; and

c. Other acts of retaliation based upon the Plaintiff's complaints of discrimination, to be determined through discovery.

93. As a direct and proximate result of Defendants' retaliatory conduct toward Plaintiff, Plaintiff has suffered and will in the future suffer damages including, but not limited to:

a. Loss of employment;

b. Loss of promotional opportunities;

c. Loss of employee benefits;

d. Loss of bonuses;

e. Loss of wages, commissions, and earning potential;

f. Loss of value of professional certifications;

g. Loss of professional esteem and consequent damage to Plaintiff's professional career;

h. Extreme embarrassment, humiliation, inconvenience, mental anguish, indignity, outrage and disappointment;

i. Exemplary damages;

j. Other damages to be determined.

WHEREFORE, Plaintiff prays that this Honorable Court enter Judgment against Defendants, in whatever amount the Court or Jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, past and future, together with interest, costs, and an award of attorney fees.

Respectfully submitted,

DIB, FAGAN AND BRAULT, P.C.

By: /s/ *Darcie R. Brault*

Darcie R. Brault (P43864)
Attorney for Plaintiff
25892 Woodward Avenue
Royal Oak, MI 48067-0910
(248) 542-6300
dbrault@dibandfagan.com

Dated: May 25, 2011

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM HOGAN,

Plaintiff,

-vs-

Case No.
Hon.

THE ROMINE GROUP doing business as BRADFORD ACADEMY ELEMENTARY SCHOOL and NICHOLUS SOUTH,

Defendants.

---

Darcie R. Brault (P43864)
DIB, FAGAN AND BRAULT, P.C.
Attorney for Plaintiff
25892 Woodward Avenue
Royal Oak, MI 48067-0910
(248) 542-6300
dbrault@dibandfagan.com

---

**PLAINTIFF'S DEMAND FOR JURY TRIAL**

NOW COMES Plaintiff, by and through his attorneys, DIB, FAGAN AND BRAULT, P.C., and hereby demands trial by jury on the above matter.

Respectfully submitted,

DIB, FAGAN AND BRAULT, P.C.

By: */s/ Darcie R. Brault*
Darcie R. Brault (P43864)
Attorney for Plaintiff
25892 Woodward Avenue
Royal Oak, MI 48067-0910
(248) 542-6300
dbrault@dibandfagan.com

Dated: May 25, 2011